UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER BONDS, | ) |
| | ) |
| Plaintiff, | ) No. 09 C 2726 |
| | ) |
| v. | ) |
| | ) Judge Ruben Castillo |
| DETECTIVE EDWIN FIZER and the | ) |
| CITY OF CHICAGO, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Christopher Bonds ("Bonds") brings this action under 42 U.S.C. § 1983 ("Section 1983"), alleging a violation of the Fourth Amendment against Detective Edwin Fizer III ("Fizer") and the City of Chicago (the "City") (collectively, "Defendants"). (R. 1, Compl.) Bonds also brings a state law malicious prosecution claim against Defendants. (*Id.*) Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (R. 27, Defs.' Mot.) For the reasons stated below, the motion is granted.

## RELEVANT FACTS[1]

Bonds and his wife, Zephye Bonds ("Mrs. Bonds"), began caring for Mrs. Bonds' elderly aunt, Susie Smith ("Smith") in 1995. (R. 37, Defs.' Resp. ¶ 2.) Smith was diagnosed with

---

[1] The relevant facts have been culled from Defendants' Local Rule 56.1 Statement of Material Facts ("Defs.' Facts"), Plaintiff's Local Rule 56.1 Response ("Pl.'s Resp.") and Statement of Additional Facts ("Pl.'s Facts"), and Defendant's Response to Plaintiff's Statement of Additional Facts ("Defs.' Resp."). The Court also relied upon exhibits contained in Plaintiff's Appendix of Exhibits in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s App.") and Defendants' Appendix in Support of their Motion for Summary Judgment ("Defs.' App.").

dementia in March 2007. (*Id.*) In approximately May 2007, Smith began having delusions that Bonds and his wife were trying to kill her by poisoning her. (*Id.* ¶ 3.) Despite these delusions, Smith moved in with Bonds and his three children in March 2008 after her dementia worsened and she became a danger to herself. (*Id.* ¶ 2.)

On May 18, 2008, Smith began ranting about a gardener working in the yard and started swearing in the presence of Bonds' children. (*Id.* ¶ 4.) After Bonds told her that she would be wheeled to her bedroom if she did not behave, Smith wheeled herself to the front door of the house in an apparent attempt to exit the home. (*Id.*) Bonds subsequently approached Smith with a glass of juice. (*Id.*) While Bonds was near her, Smith elbowed him in the groin, stood up from her wheelchair, struck him in the face, and knocked his glasses off. (*Id.*) In response, Bonds grabbed both of her wrists until she calmed down. (*Id.*)

Once she was relatively pacified, Bonds called 911 and requested a paramedic for the then ninety-four-year-old Smith. (R. 34, Pl.'s App., Ex. Q.) Two officers arrived at Bonds' home and questioned him, his wife, their then six-year-old daughter, Sarah Bonds ("Sarah"), and Smith. (R. 37, Defs.' Resp. ¶¶ 8-9.) In her account of what took place, Smith claimed she had been hit in the chest and grabbed around the neck. (*Id.* ¶ 9.) As a result of these allegations, the police requested that the paramedics bring Smith to her bedroom, where paramedics partially disrobed her and examined her for injuries. (*Id.*) This examination did not reveal any injuries. (*Id.* ¶ 10.)

The next day, Smith's in-home caregiver, Stephanie Williams ("Williams") arrived at the Bonds' home to care for Smith. (R. 33, Pl.'s Facts ¶ 36.) During her visit, Smith told Williams that Bonds hit and tried to kill her. (*Id.*) According to Williams, she then asked Smith to show

2

her where she had been hit. (R. 34, Pl.'s App. at 21-22.) When Smith indicated the "center left" of her chest, Williams visually examined and palpated the area. (*Id.*) Williams claims she did not see or feel an injury. (*Id.*)

On May 21, 2008, Smith was admitted to the hospital after complaining of shortness of breath and chest pain. (R. 34, Pl.'s App., Ex. S.)[2] In her report, Dr. Rome, the emergency room physician who examined Smith, noted that she had a "difficult time getting more details regarding the nature of the chest pain due to the patient's dementia." (R. 34, Pl.'s App., Ex. S.) On May 22, Smith had to be restrained to her bed because, according to a box checked by hospital personnel, she had "an inability to understand and follow repeated directions and is at high risk for interrupting/discontinuing [her] treatment." (*Id.* at Ex. T.)[3]

Later that day, Smith was examined by Dr. Husseini, who provided the following report:

> I believe she is of excellent mental capacity for her age, although she has episodes of forgetfulness, but in my judgment she is able to give an adequate history which she said that her niece's husband hit her on the chest on Sunday. Initially she told everybody that was the story and stopped right there, but to me with one of the nurses present she said that he tried to choke her, even tried to kill her. We are not sure about the latest part of the story because this is the first time and the only time she mentioned that, but clearly she had trauma on the chest wall, left upper chest area which is mildly swollen, very tender . . .

---

[2] On November 4, 2009, the Court entered an Agreed Qualified Health Insurance Portability and Accountability Act (HIPAA) and Confidential Matter Protective Order. (R. 19, Protective Order.) As part of this order, confidential matter produced during the course of this proceeding was to be filed with the Court and handled in accordance with Local Rule 26.2(e). (*Id.* ¶ C.5.) The Court admonishes Bonds' attorney for blatantly violating this order by improperly filing documents containing confidential matter. Because the Court has no information that Smith was harmed by this violation, we will not impose sanctions at this time. Nevertheless, if the Court learns that this violation damaged Smith in some way, we will consider imposing appropriate sanctions.

[3] The renewal medical restraint order, dated May 23, also indicated that she was "restless/agitated." (R. 34, Pl.'s App., Ex. T.)

3

(R. 29, Defs.' App., Ex. F-1, at 1.)

After examining Smith, Dr. Husseini contacted social services. (*Id.* at 2.) Kimberly Borgman ("Borgman"), a hospital social worker, spoke with Smith that same day. (R. 29, Defs.' App., Ex. L.) In her report, she stated that she had "received an MD order for possible elder abuse and he requests a police report to be made." (*Id.*) She also noted that Smith stated that her nephew-in-law "jumped her and hit her in the chest." (*Id.*) Borgman's report also indicates that Smith told her that "it was the first time he had done this and he did it because 'she is old and all the other old people in the family have died.'" (*Id.*)

On May 23, Chicago Police Officer Thomas Shannon ("Shannon") was dispatched to the hospital. (R. 29, Defs.' Facts ¶ 4.) Shannon met with Smith, who told him that Bonds "went crazy and roughed her up" on May 18. (*Id.*) Shannon wrote down Smith's statement in a general offense case report. (*Id.* ¶ 5.)

Fizer was subsequently assigned to investigate Smith's case after receiving Shannon's general offense case incident report. (*Id.* ¶ 6.) Shannon and Fizer never spoke about the general offense case report or about Smith's allegations. (*Id.* ¶ 8.) Based on his reading of the narrative in the report, which stated that Bonds "had went crazy and roughed her up" and also indicated that Smith was possibly being exploited for financial gain, Fizer determined there was sufficient cause to proceed with an investigation. (R. 34, Pl.'s App., Ex. B at 53-54.) According to her discharge report, Smith was released from the hospital on May 24. (R. 29, Defs.' App., Ex. F-2.)

On or about June 9, 2008, Fizer spoke on the telephone with Sarah Roach ("Roach"), Smith's niece, to set up an interview with Smith. (R. 29, Defs.' Facts ¶ 9.) Fizer asked Roach to bring Smith to the Area 2 police station for an interview. (*Id.* ¶ 10.) Fizer also asked Roach if

4

she or Smith "had any evidence, corroborating statements made on the report that Mr. Bonds had roughed her up"; Roach told him that they had medical records to support the allegations. (*Id.* ¶ 11.) Fizer asked Roach to bring those records to the interview. (*Id.* ¶ 12.)

Roach and Smith arrived at the Area 2 Detective Division on June 12 and met with Fizer. (*Id.* ¶ 13.) In response to Fizer's telephone request, they brought medical records from the hospital. (R. 37, Defs.' Resp. ¶ 20.) According to Fizer, during this interview, all he wanted was for Smith to "tell her story" and to "see if she was lucid, if she was clear, if she was coherent." (R. 34, Pl.'s App., Ex. B at 64.) Fizer claims that the story she provided during their meeting corroborated what was described in the case report. (*Id.*) Based on the medical records brought to the interview, Fizer also learned that Smith had a history of dementia.[4] (R. 34, Pl.'s App., Ex. B at 208.)

As part of his investigation, Fizer reviewed Dr. Husseini's report. (R. 29, Defs.' Facts ¶¶ 20-22; Defs.' App., Ex. F-1.) He also reviewed the reports issued by Dr. Rome and Borgman.[5] (*Id.* ¶ 23; Defs.' App., Ex. L.) Based on the allegations in the case report, his interview with Smith, and these three reports, Fizer claims he had probable cause to arrest Bonds. (R. 29, Defs.' App., Ex. B at 106, 197-199.)

---

[4] During this interview, Fizer did not ask about any medications Smith was taking, her having to be physically restrained for her own well-being, or the neurology consultation that was ordered for her. (R. 37, Defs.' Resp. ¶ 23.)

[5] There is conflicting testimony regarding whether Fizer reviewed the Dr. Rome report prior to arresting Bonds. Since Defendants acknowledge in their reply brief that Fizer reviewed the report prior to arresting Bonds, (R. 35, Defs.' Reply at 4-5), this fact is deemed admitted. *Woods v. City of Chicago*, 234 F.3d 979, 989 (7th Cir. 2000) ("An admission includes anything which is in practical fact an admission, including statements made in a brief presented to the district court.") (internal citations and quotations omitted).

On June 26, 2008, Fizer called Bonds but was unable to reach him. (R. 29, Defs.' App., Ex. E at 216.) He did, however, speak with Mrs. Bonds. (*Id.*) In his conversation with her, he indicated that he wanted to speak with Bonds. (*Id.*) Mrs. Bonds subsequently contacted Bonds, who then called Fizer that same day. (*Id.* at 217.) During their conversation, Fizer told him to appear at the Area 2 Detective Division. (R. 29, Defs.' Facts ¶ 26.) Bonds agreed to meet with Fizer at Area 2 on June 28, 2008. (*Id.* ¶ 27.)

Bonds arrived at Area 2 on June 28 at approximately 9:00 a.m. (*Id.*) Upon his arrival, he was arrested by Fizer and handcuffed. (*Id.* ¶ 29.) After being read his *Miranda* rights, Bonds requested counsel. (*Id.* ¶¶ 30, 32.) At approximately 9:30 a.m., Bonds' attorney, Vincent Waller ("Waller"), arrived at Area 2 and was taken to Fizer's office, where Fizer sat filling out documents while Bonds was handcuffed to the wall. (R. 33, Pl.'s Facts ¶ 25.) After Waller asked if he could speak to Bonds alone, Fizer stepped out of the room. (*Id.* ¶ 27.) Bonds subsequently gave Waller the keys to his car so that Waller could retrieve documents he wanted him to review. (R. 33, Pl.'s Facts ¶ 27.)

Upon his return to Fizer's office, Waller claims he tried to explain to Fizer that the arrest was "obviously some kind of misunderstanding" stemming from certain family members "taking advantage of [Smith's] psychosis or what have you and this inclination that [Bonds] was trying to kill her." (R. 34, Pl.'s App., Ex. A at 35-36.) Waller also suggested to Fizer that he interview Sarah, Williams, the medical staff at the hospital, and her regular physicians at the University of Chicago Hospital who diagnosed Smith with dementia. (R. 29, Pl.'s Facts ¶ 29.) Finally, Waller claims that he turned over documents that "went toward [Smith's] incapacity, her mental incapacity, and also her tendency towards erratic and violent behavior." (R. 34, Pl.'s App., Ex. A

6

at 78.)

That same day, Fizer called the State's Attorney's Office to advise them about an alleged aggravated assault on a senior citizen. (R. 29, Defs.' Facts ¶ 34.) Assistant Cook County State's Attorney Martha Kross ("Kross") arrived at Area 2 at approximately 9:30 a.m. (*Id.*) According to Kross, she spoke with Fizer about the investigation and was "briefed on the circumstances of the aggravated battery and the statements made by the victim." (R. 29, Defs.' App., Ex. G ¶ 6.) During her visit to Area 2, Kross did not speak with Bonds; she did, however, interview Smith, who told her that on May 18, 2008, she and Bonds had been arguing when Bonds "elbowed her in the chest and twisted her head, choking her." (R. 29, Defs.' App., Ex. G ¶¶ 8-9.)

Kross also spoke with Roach and Smith's son, Henry Smith ("Henry"), who confirmed that Smith told them about the alleged May 18, 2008 incident while she was hospitalized. (R. 29, Defs.' Facts ¶ 41.) Additionally, Kross and Fizer also spoke to Williams and Phyllis Walker, R.N. ("Walker"), another health care provider, who stated that Bonds called her on May 21, 2008 and told her that Smith was having chest pains (R. 29, Defs.' App., Ex. G ¶ 13; R. 34, Pl.'s App., Ex. F at 73-74.)

Kross also obtained permission to speak with Sarah, and interviewed her in the presence of Mrs. Bonds and Fizer. (R. 29, Defs.' Facts ¶ 47.) The parties present divergent accounts of what took place during this interview. According to Defendants, Sarah told Kross that after an argument, Bonds grabbed Smith's hands and placed his hands on Smith's neck. (*Id.* ¶ 48.) Defendants assert that at the time Sarah related this story to Kross and Fizer, she demonstrated a choking motion with her own hands around her neck. (*Id.* ¶ 49.) Bonds, however, maintains that during this interview Sarah did not indicate that he choked Smith. (R. 34, Pl.'s App. Ex. L at 65-

7

66.)

Fizer and Kross also spoke with Dr. Husseini on June 28. (R. 34, Pl.'s App., Ex. M.) In his report documenting this conversation, Fizer notes that Dr. Husseini stated that Smith's injuries could have happened another way, but were consistent with Smith's allegations. (*Id.*; Ex. B at 153-54.) Fizer's report also indicates that Smith told Husseini that Bonds was "trying to kill her." (*Id.*, Pl.'s App., Ex. M.)

Defendants claim that based on her consideration of the information provided by Smith, the statements made by witnesses she interviewed, her review of the medical records and interview with Husseini, Kross approved charges of aggravated battery to a senior citizen at 2:35 p.m. on June 28, 2008.[6] (R. 29, Defs.' Facts ¶ 54.) The decision to charge and prosecute Bonds with aggravated battery to a senior citizen was made by the State's Attorney's Office. (*Id.* ¶ 55.)

On August 4, 2008, a grand jury indicted Bonds for aggravated battery of a senior citizen. (*Id.* ¶ 56.) Approximately two months after the indictment, Smith passed away.[7] (R. 29, Defs.' Facts ¶ 57.)

## PROCEDURAL HISTORY

On May 4, 2009, Bonds filed a three-count complaint. (R. 1, Compl.) Bonds brings Count I pursuant to Section 1983 and alleges that Fizer violated the Fourth Amendment by "falsely detaining, arresting and imprisoning [him] without reasonable suspicion or probable

---

[6] Illinois law defines the crime of aggravated battery of a senior citizen as follows: "A person who, in committing battery, intentionally or knowingly causes great bodily harm or permanent disability or disfigurement to an individual of 60 years of age or older commits aggravated battery of a senior citizen." 720 Ill. Comp. Stat. 5/12-4.6 (2002).

[7] Bonds' criminal case was dismissed *nolle prosequi* by the State's Attorney's Office on November 17, 2008. (*Id.* ¶ 58.)

8

cause." (*Id.* ¶ 36.) Count II sets forth a state law claim for malicious prosecution stemming from the same set of events. (*Id.* ¶¶ 38-41.) Finally, in Count III, Bonds brings an indemnification claim against the City. (*Id.* ¶¶ 42-44.)

Defendants filed a motion for summary judgment on February 11, 2010. (R. 27, Defs.' Mot.) Defendants make several arguments in support of their motion. First, they argue that because Fizer had probable cause to arrest Bonds, there was no constitutional violation. (R. 28, Defs.' Mem. at 5-8.) They also contend that summary judgment is proper with respect to Count I because Fizer is entitled to qualified immunity. (*Id.* at 9-10.) Next, they argue that Bonds' malicious prosecution claim fails because he does not prove each of the required elements. (*Id.* at 10-13.) Finally, Defendants maintain that the indemnification claim against the City fails because there is no underlying primary liability against Fizer. (*Id.* at 13.)

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007). In ruling on a motion for summary judgment, the Court must consider the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences and resolving all doubts in the nonmoving party's favor. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

The moving party has the initial burden of demonstrating that it is entitled to summary

judgment. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Once a moving party has met this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The nonmoving party must show that there is evidence upon which a jury reasonably could find for the plaintiff." *Wheeler*, 539 F.3d at 634.

## ANALYSIS

### I. Fourth Amendment False Arrest Claim

#### A. Probable cause

Probable cause is an absolute bar to a claim of false arrest under the Fourth Amendment. *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010). Officers possess probable cause to arrest when "the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense." *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007) (internal quotation and citation omitted). A court evaluates "probable cause not with the benefit of hindsight, and not on the facts as perceived by an omniscient observer, but on the facts as they appeared to a reasonable person in the defendant's position, even if that reasonable belief turned out to be incorrect." *Stokes*, 599 F.3d at 622.

To make a probable cause determination, "an arresting officer is not required to act as a judge or jury to determine whether a person's conduct satisfies all of the essential elements of a particular statute." *Id.* at 622-23. "Rather, probable cause involves the exercise of judgment, which 'turn[s] on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* (internal quotation and citation omitted).

10

The Seventh Circuit has observed that it does not take much to establish probable cause: the "officers must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). "In determining whether an officer had probable cause, the court steps into the shoes of a reasonable person in the position of the officer." *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008).

Whether an officer had probable cause to make an arrest is a question that is often left to the jury. *Stokes*, 599 F.3d at 623. Indeed, in a suit for damages, it is a proper issue for the jury "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). A court, however, "may decide whether probable cause existed if the facts material to the probable cause determination are not in dispute." *Id.* Accordingly, a conclusion that probable cause exists as a matter of law is appropriate only when no reasonable jury could find that the officer did not have probable cause. *Id.*

The existence of probable cause turns on the information known to the defendant at the moment the arrest is made, and not on subsequently received information. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). Thus, as a threshold matter, the Court must first establish when an arrest took place in this case. An arrest occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Fox*, 600 F.3d at 833 (quoting *U.S. v. Tyler*, 512 F.3d 405, 409-10 (7th Cir. 2008)). Here, there is no dispute regarding the time Bonds was arrested. (R, 29, Defs.' Facts ¶¶ 26-29.) For purposes of its probable cause analysis, the Court will therefore examine the facts known to Fizer at

11

approximately 9:00 a.m. on June 28, 2008. (*Id.*)

It is well-established that the "complaint of the putative victim or single witness is generally sufficient to establish probable cause, unless the officer has reason to question the witness' account." *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007). If the complaint leads a reasonable officer to be suspicious, "the officer has a further duty to investigate." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003). Defendants argue that the account of the alleged battery conveyed by Smith to Fizer, combined with the accounts she provided to other individuals, is enough to establish probable cause. (R. 28, Defs.' Mem. at 5-6.) Bonds, on the other hand, contends that information possessed by Fizer clearly establishes that he was aware of Smith's dementia. (R. 32, Pl.'s Mem. at 9.) He maintains that summary judgment is inappropriate because, based on the information Fizer possessed, there is "room for a difference of opinion regarding whether a reasonably prudent officer would have believed probable cause existed." (*Id.* at 11.)

There are several pieces of information that, taken together, could have led a reasonable person in Fizer's position to believe that a crime had been committed. First, Fizer reviewed Shannon's general offense case report, which indicated that Bonds allegedly "went crazy and roughed her up." (R. 29, Defs.' App., Ex. D.) Based on his reading of the report, Fizer found sufficient cause to proceed with an investigation, and as part of that investigation, interviewed Smith on June 9th. (R. 34, Pl.'s App., Ex. B at 53-54.) During this interview, Fizer testifies that although Smith was "extremely agitated," she seemed "very lucid" and was "adamant" about Bonds striking her in the chest on May 18. (R. 29, Defs.' App., Ex. B at 63-66.) In addition to Shannon's report and his interview with Smith, Fizer also reviewed Dr. Husseini's report, which

12

stated that Smith was of "excellent mental capacity for her age" and that she was able to "give an adequate history" of Bonds hitting her chest. (R. 29, Defs.' App., Ex. F-1.) Further, this report indicated that Smith "clearly . . . had a trauma on the chest wall, left upper chest area which is mildly swollen" and "very tender." (R. 29, Defs.' App., Ex. F-1.) Finally, Fizer also reviewed the report from Borgman, who noted that Smith told her that Bonds "jumped her and hit her in the chest." (R. 29, Defs.' App., Ex. L.)

The Court finds that the general consistency of the account provided by Smith to several people provided Fizer with reasonably trustworthy information sufficient to warrant a prudent person in believing that Bonds had committed an offense. When an officer has received information from the putative victim who it seems reasonable to believe is telling the truth, he has probable cause. *Gerald M. v. J. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988). Here, the fact that Smith told Fizer, Dr. Husseini, and Borgman that Bonds hit her chest–combined with Dr. Husseini's report indicating some chest trauma–made it reasonable for Fizer to believe she was telling the truth. Since this information provided Fizer with more than a bare suspicion that Bonds had struck Smith, he had probable cause to arrest Bonds. The Court therefore finds that based on the information available to Fizer at 9:00 a.m. on June 28, no reasonable jury could find that he violated the Fourth Amendment.

Bonds makes several arguments in opposition to Defendants' motion. First, Bonds argues that several pieces of information received by Fizer should have raised suspicions regarding the veracity of Smith's accusations. (R. 32, Pl.'s Mem. at 9.) He correctly notes that where there is reason to believe that a victim's complaint is "fishy," officers must investigate its truthfulness. *Guzzell v. Hiller*, 223 F.3d 518, 519-20 (7th Cir. 2000). Bonds argues that the

following disputed facts should have raised Fizer's suspicion: (1) Sarah's testimony at the police station indicating that Bonds did not choke Smith; (2) Fizer's conversation with Williams in which she gave him "quite a bit of detail" about Smith, including information indicating that she had examined Smith on May 19 and did not observe any physical injury; (3) information contained in documents given to Fizer by Waller concerning Smith's dementia diagnosis and the police visit to the Bonds' home on May 18. (R. 32, Pl.'s Mem. at 9-10.) Even if the Court were to assume the truth of these facts, they are immaterial because these events occurred after Bonds was arrested. Since the existence of probable cause turns on the information known to the defendant at the moment of arrest, the Court finds Bonds' arguments based on post-arrest developments unpersuasive.

Bonds also contends that some of Smith's statements were inconsistent in that they failed to mention that he allegedly "twisted her head" or choked her. (R. 32, Pl.'s Mem. at 9.) These inconsistencies, he maintains, should have placed Smith's mental capacity in doubt. (*Id.* at 9-10.) Indeed, Bonds is correct in observing that there were some differences in Smith's statements. For example, Dr. Husseini's report indicates that the story Smith told him differed from the account provided to others. (R. 29, Defs.' App., Ex. F-1.) These differences, however, do not undermine the Court's probable cause determination. The Seventh Circuit has noted that "[n]othing suggests that a victim's report must be unfailingly consistent to provide probable cause." *Spiegel*, 196 F.3d at 725. "The credibility of a putative victim is a question not for police officers in the discharge of their considerable duties, but for the jury in a criminal trial." *Id.* Law enforcement officials are not required "to delay arresting a suspect until after they have conclusively resolved each and every inconsistency or contradiction in a victim's account." *Id.*

14

While sound police practice may have required further investigation, the Fourth Amendment does not place that burden on law enforcement officials.

Additionally, Bonds contends that Fizer "consciously disregarded the plethora of evidence that Ms. Smith's story was not based on fact but on her dementia." (R. 32, Pl.'s Mem. at 10.) Bonds correctly notes that prior to the arrest, Fizer knew Smith had a history of dementia. (R. 34, Pl.'s App., Ex. B at 208.) The record also establishes that Fizer reviewed Dr. Rome's report and the hospital restraint orders. (R. 33, Pl.'s Facts ¶ 14.) In essence, Bonds argues that a reasonable officer with knowledge of Smith's history of dementia and the manifestations of her illness would not have believed probable cause existed. (*See* R. 32, Pl.'s Mem. at 11.) The Court disagrees with this argument.

First, Smith's medical condition, by itself, does not unsettle the Court's probable cause determination. The mere fact that Fizer knew that Smith had dementia does not automatically render her accusations untrustworthy. Indeed, the Seventh Circuit has noted that it is a "common mistake to exaggerate the degree to which senile dementia renders an individual mentally incompetent" and that, prior to its terminal stage, "the severity of the dementia varies from day to day, even from hour to hour." *Boyce v. Fernandes*, 77 F.3d 946, 949 (7th Cir. 1996). Bonds points to nothing establishing that people with a history of dementia are untrustworthy as a matter of law.

Second, Fizer's knowledge of the prior manifestations of Smith's dementia do not lead to the conclusion that Fizer did not have probable cause to arrest Bonds. By the time of arrest, Fizer had reviewed Dr. Rome's report, which indicated that she had a "difficult time getting more details regarding the nature of the chest pain due to [Smith's] dementia." (R. 34, Pl.'s App., Ex.

15

S.) In addition, the hospital restraint orders stated that Smith had an "inability to understand and follow repeated directions and is a high risk for interrupting/discontinuing [her] treatment." (R. 34, Pl.'s App., Ex. T.) While this information may undermine her credibility, it does not render Smith's accusations suspicious. Although less than ideal, questionable citizen complaints are sufficient to establish probable cause. *E.g.*, *Spiegel*, 196 F.3d at 724-26 (finding that defendant had probable cause to arrest plaintiff despite victim waiting nearly a month to make a report, inconsistencies in the victim's report, and evidence suggesting that the victim's charge against plaintiff was retaliatory); *Conneely*, 858 F.2d at 380-81 (affirming lower court's grant of summary judgment for officer, finding that the uncorroborated complaint of a ten-year-old boy was enough to establish probable cause, despite the fact that there was a general animosity between the families of the accuser and accused). In this case, Fizer actually obtained corroborating evidence to support Smith's claim from a doctor and a social worker. This information, coupled with Smith's declaration, is sufficient to support a probable cause determination.

The issue here is not whether Bonds actually committed the crime of aggravated battery to a senior citizen. Rather, the Court's inquiry must solely focus on whether the facts taken in the light most favorable to Bonds show that a reasonable person in Fizer's position would have had probable cause to believe that Bonds struck Smith. The Court finds that based on all the information available to Fizer at 9:00 a.m on June 28, no reasonable jury could find that he did not have probable cause to arrest Bonds. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Count I.

## B. Qualified immunity

Even if the Court were to conclude that a reasonable jury could find that Fizer arrested Bonds without probable cause, qualified immunity would protect Fizer from civil liability. "Whether police officers had probable cause to arrest a suspect and whether they are entitled to qualified immunity for the arrest are closely related questions, although qualified immunity provides the officers with 'an additional layer of protection against civil liability' if a reviewing court finds that they did not have probable cause." *Williams v. Jaglowski*, 269 F.3d 778, 781 (7th Cir. 2001). Because qualified immunity protects all "but the plainly incompetent or those who knowingly violate the law, a law enforcement officer will be immune to claims based on an arrest without probable cause unless it is obvious that no reasonably competent officer would have believed that there was probable cause to arrest." *Spiegel*, 196 F.3d at 723 (internal quotation marks and citation omitted). "Thus, qualified immunity applies not only to those officials who correctly determine that probable cause to arrest exists, but also to those government officials who reasonably but mistakenly conclude that it does." *Id.* (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). Indeed, the doctrine of qualified immunity leaves "ample room for mistaken judgments." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003). As the Seventh Circuit has stated, "[i]f a case involves a question of whether probable cause existed to support an officer's actions, the case should *not* be permitted to go to trial if there is any reasonable basis to conclude that probable cause existed." *Humphrey v. Staszak*, 148 F.3d 719, 727 (7th Cir. 1998) (internal citations omitted).

If an officer can establish "arguable probable cause" to arrest the plaintiff, then he is entitled to qualified immunity. *Williams*, 269 F.3d at 781. Arguable probable cause exists when

17

"a reasonable police officer in the same circumstances and with the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Humphrey*, 148 F.3d at 725. Here, the information received during the Smith interview, along with the Dr. Husseini and Borgman reports, point to one general conclusion: that Bonds hit Smith's chest. Thus, this information could have provided a reasonable officer with a basis to believe that probable cause existed to arrest Bonds for the crime of aggravated battery of a senior citizen. Accordingly, the Court finds that even if Fizer did not actually have probable cause to arrest Bonds, he is entitled to qualified immunity.

"A plaintiff seeking to defeat the assertion of qualified immunity must establish that the law concerning the plaintiff's asserted right was clearly established at the time the challenged conduct occurred." *Koger v. Bryan*, 523 F.3d 789, 802 (7th Cir. 2008) (internal quotation and citation omitted). Moreover, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A plaintiff can demonstrate that the right was clearly established by either: (1) presenting a closely analogous case that establishes that the defendant's conduct was unconstitutional; or (2) presenting evidence that the defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court. *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010). This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

In this case, Bonds fails to present any cases establishing or providing strong support for the proposition that Fizer had a constitutional duty to further investigate Smith's allegations once

18

he became aware of her mental illness and its previous manifestations. (*See* R. 32, Pl.'s Mem. at 11-12.) Further, the Court finds that he has not presented evidence indicating that Fizer's conduct amounted to a "violation . . . so obvious that a reasonable [officer] would know that what [he did] violated the Constitution." *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001). Indeed, as previously discussed, a reasonable officer in the same circumstances and with the same knowledge as Fizer could have reasonably believed that probable cause existed in light of well-established law. Thus, the Court finds Bonds' contention that Fizer is not entitled to qualified immunity unconvincing.

## II.     Malicious Prosecution Claim

A district court may decline to exercise supplemental jurisdiction over a state law claim where it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Because the Court has granted summary judgment on Bonds' federal claim, there are no claims remaining over which we have original jurisdiction. "When all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish supplemental jurisdiction pursuant to § 1367(c)(3)." *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 607 (7th Cir. 2008). Although Bonds' state law claim for malicious prosecution remains, the Court declines to exercise its supplemental jurisdiction and will dismiss Count II. After carefully reviewing the arguments presented, the Court finds that the merits of the malicious prosecution claim would be best left for a more focused presentation before a state court. This dismissal, however, is without prejudice to the refiling of the claim in state court if Bonds so chooses. *See* 28 U.S.C. § 1367(d) (explicitly tolling the statute of limitations during the pendency of the federal action and for thirty days after dismissal of the supplemental claim to

allow the plaintiff to re-file in state court).

## III. Indemnification Claim

In Illinois, "a local public entity is not liable for an injury from an act or omission of its employee where the employee is not liable." 745 Ill. Comp. Stat. 10/2-109 (2002). Because the Court has granted Defendant's motion for summary judgment with respect to Bonds' federal claim and has dismissed his malicious prosecution claim for want of jurisdiction, there has been no finding of liability against Fizer. Thus, in the absence of such a finding, the Court grants summary judgment in favor of the City on Count III.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (R. 27) is GRANTED. The clerk of the Court is directed to enter judgment in favor of Defendants and against Bonds.

Entered: 

**Judge Ruben Castillo**
**United States District Court**

**Dated:** May 20, 2010